# IN THE COURT OF APPEALS OF IOWA

No. 15-2093
Filed June 7, 2017

**CHRISTOPHER ROBIN SCHMIDT,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Linn County, Lars G. Anderson, Judge.

Applicant appeals the district court's denial of his application for postconviction relief. **AFFIRMED.**

Geneva L. Williams of Williams Law Office, P.L.L.C., Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Kelli Huser, Assistant Attorney General, for appellee State.

Considered by Danilson, C.J., Doyle, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**BLANE, Senior Judge.**

Applicant Christopher Robin Schmidt appeals the district court's denial of his seven ineffective-assistance-of-counsel claims asserted in his amended application for postconviction relief (PCR) from his 2007 first-degree murder conviction. Based upon our review, we find the district court properly denied the amended application and affirm.

### I. Factual and procedural background.

Schmidt and the victim, Robert Nelson, were acquaintances. On Thursday, December 28, 2006, Nelson's neighbors heard noises around 10:00 p.m. On December 31, an apartment manager opened Nelson's apartment and found his dead body. Police learned that Schmidt was an acquaintance of Nelson, questioned Schmidt and his girlfriend, and learned that Schmidt had been renting a car from Nelson. Schmidt reported that he last saw Nelson the prior Tuesday or Wednesday.

Police later called Schmidt in for a recorded interview when they learned his fingerprints were on a barstool used to kill Nelson. Schmidt confirmed he was renting Nelson's car for $100 and that it was in the shop. Schmidt also said that he went to Nelson's apartment to take him groceries and watch TV. Schmidt's story had changed somewhat. He said he saw Nelson on Thursday, not Tuesday or Wednesday. Schmidt said they were alone in the apartment and that he left around 9:30 p.m.

Police confronted Schmidt with the fact that he told a different story to his girlfriend. Schmidt then offered another explanation. He said he had gone to Nelson's apartment to get a refund of the money he paid for the car, but he only

got $100. He said a man he did not know came to Nelson's apartment and punched Nelson in the nose, causing a bloody Nelson to fall on Schmidt's lap. Schmidt added that the man accused Nelson of cheating on him and the man also struck Nelson on the *back* of the head with a barstool. Schmidt then left the apartment and disposed of his clothes—pants in a storm drain and his shirt in a cemetery. He admitted the shirt had blood on it. Schmidt denied hitting Nelson and said Nelson was still alive when he left.

Schmidt's fourth version of events was that he and Nelson had argued over money for the car—money which Schmidt needed to pay rent. According to Schmidt, Nelson shoved him into a wall and Schmidt punched Nelson in the nose. Nelson shoved Schmidt again and Schmidt hit Nelson with a barstool while Nelson was standing. Nelson went to the ground but kept trying to get back up, so Schmidt kept hitting him with barstools. Schmidt left Nelson on the floor, went home and showered with his shirt on, and later disposed of his shirt and pants.

Nelson sustained fractures to his skull, numerous lacerations to the face, and had four teeth knocked out. He sustained at least three blows, probably four, to the face. Based on the forensic findings, including blood-spatter analysis: three barstools were used and each broke into pieces; the stools were held upright by their legs and the seat struck Nelson; Nelson sustained the first blow on the couch, and then he moved to the floor under a window where he died. There was no evidence of mutual combat.

Schmidt was charged on January 11, 2007, with first-degree murder for killing Nelson. Schmidt was represented in the criminal proceedings by attorneys

Tyler Johnston and Ahmet Gonlubal.[1]  A jury found Schmidt guilty of first-degree murder on December 14, 2007.

Schmidt filed an appeal and we affirmed his conviction in *State v. Schmidt*, No. 07-2152, 2009 WL 776577 (Iowa Ct. App. Mar. 26, 2009).  Schmidt filed his pro se application for PCR on May 21, 2010.  An amended and substituted application for PCR was filed on January 16, 2015.  The amended application asserted numerous instances of ineffective assistance of trial and appellate counsel.  The district court conducted a civil bench trial on Schmidt's amended application on September 16, 2015.  On November 16, 2015, the PCR court issued a ruling denying Schmidt's amended application.  Schmidt timely filed his notice of appeal on December 9, 2015.

## II. Standard of review.

Ineffective-assistance-of-counsel claims are grounded in the Sixth Amendment and are reviewed de novo.  *See State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).  To prove ineffective assistance of counsel, Schmidt must show both that counsel breached an essential duty and that as a result of this breach, prejudice occurred.  *State v. Brothern*, 832 N.W.2d 187, 192 (Iowa 2013); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984).

## III. Failing to challenge the State's expert fingerprint evidence.

Evidence of Schmidt's fingerprints and palm print on the barstools used to kill Nelson in Nelson's apartment was admitted during the trial.  Schmidt argues in postconviction relief that his trial counsel was ineffective for failing to object to

---

[1] Attorney Gonlubal was deceased at the time of the postconviction-relief trial.

such evidence being offered. Schmidt contends "[p]rominent experts in the forensic science community have suggested that latent fingerprint identification may not be nearly as reliable as people have long assumed."[2] Schmidt does not cite any state or federal appellate court cases holding fingerprint evidence is not reliable and inadmissible. Schmidt also did not present any evidence at the PCR trial that specifically challenged the validity of the fingerprint evidence submitted at his criminal trial.

Fingerprint evidence is admissible in Iowa courts and was admissible at the time of Schmidt's trial in 2007. *See State v. Sellers*, 215 N.W.2d 231, 232 (Iowa 1974); *State v. Moore,* No. 14-0557, 2015 WL 1817028, at *4 (Iowa Ct. App. Apr. 22, 2015) (finding counsel was not ineffective for declining to object to fingerprint evidence). Expert testimony about fingerprint evidence falls under Iowa Rule of Evidence 5.702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Iowa courts follow a liberal view to admit expert testimony. *Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 531 (Iowa 1999). Iowa courts have not adopted the *Daubert* standard for expert testimony. *Id.* at 532. The only requirements for admission are as follows: (1) the evidence must be relevant, (2) the testimony

---

[2] Robert Epstein, *Fingerprints Meet* Daubert*: The Myth of Fingerprint "Science" is Revealed*, 75 S. Cal. L. Rev. 605, 605–06 (Mar. 2002); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993) (setting forth test for admissibility of expert testimony that includes a trial court's "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid").

must be in the form of "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue," and (3) the expert must be "qualified as an expert by knowledge, skill, experience, training, or education." *Id.* at 533. Even in jurisdictions that utilize the stricter *Daubert* standard, fingerprint evidence is often admitted. *United States v. John*, 597 F.3d 263, 274 (5th Cir. 2010) ("We agree that in most cases, absent novel challenges, fingerprint evidence is sufficiently reliable to satisfy Rule 702 and *Daubert.*"); *see also United States v. Pena*, 586 F.3d 105, 110–11 (1st Cir. 2009); *United States v. Baines*, 573 F.3d 979, 992 (10th Cir. 2009); *United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005); *United States v. Mitchell*, 365 F.3d 215, 246 (3d Cir. 2004); *United States v. George*, 363 F.3d 666, 672–73 (7th Cir. 2004); *United States v. Collins*, 340 F.3d 672, 682–83 (8th Cir. 2003); *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).

Numerous state appellate courts in recent years have also held that fingerprint evidence is adequately reliable to be admitted in their trial courts. *State v. Favela*, 323 P.3d 716, 718 (Ariz. Ct. App. 2014); *People v. Rivas,* 190 Cal. Rptr. 3d 43, 53 (Cal. Ct. App. 2015); *People v. Wilson*, 318 P.3d 538, 546 (Colo. App. 2013); *People v. Mitchell,* 955 N.E.2d 1180, 1185–87 (Ill. App. Ct. 2011); *State v. Hightower*, 511 S.W.3d 454, 460 (Mo. Ct. App. 2017); *State v. Ferrara*, 42 N.E.3d 224, 230 (Ohio Ct. App. 2015); *State v. Woodard*, 330 P.3d 1283, 1287–88 (Utah Ct. App. 2014); *State v. Washington*, No. 73162-9-1, 2016 WL 3190528, at *2 (Wash. Ct. App. June 6, 2016) ("'[T]he reliability of fingerprint identification has been tested in our adversarial system for over a century and routinely subjected to peer review,' and has long been accepted by both the

scientific community and Washington courts."); *State v. Pigott*, 325 P.3d 247, 250 (Wash. Ct. App. 2014).

> "Trial counsel has no duty to raise an issue that has no merit." *State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003). We do not expect counsel to anticipate changes in the law, and counsel will not be found ineffective for a lack of "clairvoyance." *See* [*State v. Williams*, 695 N.W.2d 23, 30 (Iowa 2008)]. However, "[i]n situations where the merit of a particular issue is not clear from Iowa law, the test 'is whether a normally competent attorney would have concluded that the question . . . was not worth raising.'" *Graves*, 668 N.W.2d at 881 (quoting *State v. Schoelerman*, 315 N.W.2d 67, 72 (Iowa 1982)); *see also State v. Westeen,* 591 N.W.2d 203, 210 (Iowa 1999).

*Millam v. State*, 745 N.W.2d 719, 721–22 (Iowa 2008) (second alteration in original). At the time of Schmidt's murder trial in 2007, the state of the law in Iowa was clear—fingerprint-identification evidence offered by a qualified expert was (and still is) admissible. Schmidt's trial counsel was not ineffective for not objecting to the fingerprint evidence.

In his appeal brief, Schmidt also argues that his trial attorneys were ineffective in not properly cross-examining the fingerprint identification witnesses so as to challenge the validity of the fingerprint evidence. He claims that his trial attorney's failure to challenge the qualifications of the fingerprint experts deprived him of presenting an alternative theory of defense. Three separate expert witnesses testified to the fingerprint evidence at Schmidt's criminal trial. As the record shows, these fingerprint experts were highly trained and experienced and, under Iowa Rule of Evidence 5.702, qualified to testify. *See State v. Taylor*, 201 N.W.2d 724, 726 (Iowa 1972). Again, since fingerprint evidence was admissible and the State's expert witnesses were qualified, Schmidt's trial counsel was not

ineffective for failing to challenge either the fingerprint evidence or the State's expert witnesses.

Further, we agree with the State, based upon the defense Schmidt presented at his criminal trial, he was not prejudiced by the fingerprint evidence. Schmidt gave police several different versions of what happened. He first denied being present, but when confronted by police with the fingerprint and palm print evidence on the three barstools found in Nelson's apartment, Schmidt changed his story several times. At one point he claimed an unknown intruder came into Nelson's apartment and assaulted Nelson. Eventually, Schmidt gave a final version during which he claimed Nelson assaulted him and he was acting in self-defense. This was the defense theory pursued at trial in an effort to obtain an acquittal or conviction of a lesser charge. Schmidt's admission to police and at trial that he had an altercation with Nelson placed him at the scene. Thus, presentation of the fingerprint evidence was not prejudicial.[3]

### IV. Failing to challenge the State's bloodstain evidence.

Schmidt argues bloodstain pattern analysis has been subject to the same type of criticism as fingerprint evidence. Since his trial attorneys did not challenge the bloodstain evidence, Schmidt claims that he received ineffective assistance of counsel.

Schmidt cites only to an article published by the National Research Council opining "[t]he uncertainties associated with bloodstain pattern analysis are enormous" and that "many sources of variability arise with the production of

---

[3] Schmidt did not testify at his criminal trial, but his recorded statement given to police, which contained his admission, was played for the jury.

bloodstain patterns, and their interpretation is not nearly as straightforward as the process implies." In addition, the article complains "[b]loodstain patterns found at scenes can be complex, because although overlapping patterns may appear simple, in many cases their interpretations are difficult or impossible."[4] Schmidt does not point to any state or federal appellate decisions holding bloodstain pattern or blood spatter evidence is unreliable and not admissible.

Blood pattern evidence has been admissible in our trial courts since 1980. *See State v. Hall*, 297 N.W.2d 80, 86 (Iowa 1980). The admissibility of such evidence is determined by the Iowa Rules of Evidence, not a research journal. Numerous other state and federal courts have likewise recognized the admissibility of bloodstain or blood spatter evidence. *See Fox v. Ward*, 200 F.3d 1286, 1297 (10th Cir. 2000); *United States v. Mustafa*, 22 M.J. 165, 168 (C.M.A. 1986); *Robinson v. State*, 574 So. 2d 910, 918 (Ala. Crim. App. 1990); *State v. Downing*, 791 A.2d 649, 654–55 (Conn. App. Ct. 2002); *State v. Rodgers*, 812 P.2d 1208, 1212 (Idaho 1991); *State v. Moore*, 458 N.W.2d 90, 98 (Minn. 1990); *State v. Mix*, 781 P.2d 751, 758 (Mont. 1989); *People v. Murray*, 537 N.Y.S.2d 399, 399 (N.Y. App. Div. 1989); *State v. Goode*, 461 S.E.2d 631, 644 (N.C. 1995); *State v. Deel*, No. 11-062, 1986 WL 11203, at *18 (Ohio Ct. App. Sept. 30, 1986); *State v. Melson*, 638 S.W.2d 342, 364 (Tenn. 1982); *Holmes v. State*, 135 S.W.3d 178, 195 (Tex. Crim. App. 2004). The evidence was material to the State's theory of the case and to contradict Schmidt's theory. As with fingerprint evidence discussed above, Schmidt's trial counsel was not ineffective for failing

---

[4] There was no evidence that the bloodstains were "overlapping" in this case.

to object to the bloodstain or spatter evidence. Trial counsel did not breach an essential duty by declining to pursue this meritless issue. *State v. Greene*, 592 N.W.2d 24, 29 (Iowa 1999).

Schmidt also argues that the State's bloodstain expert witness did not meet the minimum requirements espoused by the National Research Council to testify as an expert. Since his trial attorneys did not challenge the qualifications of the State's expert on this subject, Schmidt claims that he received ineffective assistance of counsel.

Attorney Johnston testified in the PCR trial that he had deposed the bloodstain witness, Rex Sparks, and felt he was a "nutjob" and that the jury would see this. Johnston also admitted that Sparks did not come across as a "nutjob" at the trial and that his testimony was especially damaging to Schmidt. Johnston considered retaining his own bloodstain expert, but he rejected the idea because he thought it would lend legitimacy to the State's bloodstain pattern evidence.

Sparks has been in law enforcement for thirty-five years—the first seventeen years with the Story County Sheriff's Department and the last eighteen years as an identification technician with the Des Moines Police Department. His more recent training over the past thirteen years has involved bloodstain pattern analysis. He has attended various seminars in the United States and Europe, serving as an instructor at some. He has previously testified in Iowa courts as an expert in bloodstain pattern analysis.

Applying the criteria of Iowa Rule of Evidence 5.702 and *Leaf*, Sparks had the experience and training to be duly qualified as an expert to testify in the field

of bloodstain pattern analysis. Since the subject matter—bloodstain pattern analysis—is a recognized subject for expert testimony and since Sparks was sufficiently qualified to testify as an expert, any effort of Schmidt's trial counsel to object to Sparks' testimony on subject matter or qualifications would have been meritless. *See id.* Furthermore, Schmidt's trial counsel made a tactical decision regarding how to deal with Sparks' testimony informed by a deposition of Sparks. We do not ordinarily find ineffective assistance in mere miscalculations in strategy. *See Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). Schmidt's trial attorneys were not ineffective on this point.

### V. Failing to object to Sparks' testimony regarding lack of disarray in Nelson's apartment.

Schmidt complains Sparks testified, based on his review of crime scene photographs, that Nelson's apartment was not in disarray and there did not appear to have been a fight, which was inconsistent with Schmidt's defense. Schmidt contends that such testimony was not a proper subject for expert opinion and also contends Sparks was not qualified to render such opinion. Schmidt's trial attorney, Johnston, testified during the PCR trial that Sparks' testimony was improper and he should have objected to it. A review of the criminal trial transcript reveals no objection was lodged. Schmidt contends his counsel's failure to object constitutes ineffective assistance of counsel requiring reversal and a new trial.

Upon our review of the record, we cannot agree that Sparks' testimony was improper or that Sparks was not qualified to give the challenged testimony. In addition to Sparks' experience outlined above, he has investigated over a

thousand crime scenes. He viewed the crime scene photos taken by police. At Schmidt's criminal trial, Sparks initially explained why certain bloodstain evidence supported his opinion that no fight had occurred. This was based on the lack of blood drip stains in the living room area, which was a fairly confined space, as well no blood swipes, wipes or smudges, which he would expect if there had been a fight. Sparks then commented on his observation that furniture had not been disturbed or pushed out of place, undisturbed groceries were set in the "travel path," and that a stick deodorant was standing on a glass top table and not knocked over.

Iowa Rule of Evidence 5.702 requires that a witness be "qualified as an expert by knowledge, skill, experience, training or education." The testimony must fall within the witness's general area of expertise. *State v. Peterson*, 219 N.W.2d 665, 673 (Iowa 1974). However, opinion testimony is not limited to experts. A lay witness may give an opinion, but the opinion is confined to an opinion that is "rationally based on the perception of the witness" and is "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Iowa R. Evid. 5.701; *see State v. Kinsel*, 545 N.W.2d 885, 889 (Iowa Ct. App. 1996).

As discussed above, Sparks was qualified to testify about bloodstain evidence. His initial opinion that there had not been a fight, implying that Schmidt and Nelson had not fought, was based on bloodstain analysis. Upon additional questioning, Sparks opined that his opinion was supported by his observation of crime scene photographs that showed a lack of disarray in the apartment that, based upon his crime scene experience, would have existed if

there had been a fight. This latter opinion was admissible as either a proper lay opinion or an expert opinion based upon Sparks' experience and training, particularly in conjunction with his bloodstain opinion evidence.

Since Sparks' testimony was admissible, Schmidt's attorneys were not ineffective for failing to object. *See Greene*, 592 N.W.2d at 29.

### VI. Offering into evidence Schmidt's statement that had been suppressed.

Schmidt's trial attorneys filed a motion to suppress Schmidt's second interview with police. Following a hearing, the trial court granted the motion in part, finding that Schmidt had exercised his right to remain silent later in the interrogation. In the portion suppressed, Schmidt changed his story and admitted to hitting Nelson with the barstools. In the admissible portion of the recorded interview, Schmidt stated an unknown intruder had come into the apartment and struck Nelson.

At trial, Johnston, after discussion with Schmidt and co-counsel, made a tactical decision to play the entire recorded police interview, which included Schmidt's later version of what happened regarding his assault of Nelson, in which he claimed to have acted in self-defense. Schmidt claims this was an unreasonable tactical decision and ineffective assistance of counsel.

We agree with the district court's thorough evaluation and ruling on this issue:

> Schmidt claims that playing his confession to getting in a fight with Nelson and eventually hitting him in the head several times with a barstool was an unreasonable strategic decision—the Court finds that it was not. Ineffective assistance claims based on tactical or strategic decisions by trial counsel are reviewed to determine whether the decision actually resulted from tactics. *Ledezma*, 626

N.W.2d at 142. "Ineffective assistance is more likely to be established when the alleged actions or inactions of counsel are attributed to a lack of diligence as opposed to the exercise of judgment." *Id.* "Moreover, reasonable strategic considerations may justify the rejection of one theory of defense in favor of another theory reasonably perceived by counsel to be in the accused's best interest." *Anfinson v. State*, 758 N.W.2d 496, 501 (Iowa 2008). "The post-conviction court must not 'assume the role of Monday morning quarterback in condemning counsel's judgment in choosing between what are frequently equally hazardous options available to him.'" *Id.* (citing *State v. Newman*, 326 N.W.2d 788, 795 (Iowa 1982)). In this case, trial counsel did have to choose amongst "hazardous options" and this Court cannot say that the option chosen was unjustified.

It is clear that Attorneys Johnston and Gonlubol gave considerable thought to the appropriate strategy to use defending Schmidt. Considering the inconsistent stories given by Schmidt, his unsuppressed admissions, and the physical evidence which tied Schmidt to the murder weapon, trial counsel had a very difficult task no matter which strategy they employed. The fact this strategy was unsuccessful is not at all determinative. *Pettes v. State*, 418 N.W.2d 53, 56–57 (Iowa 1988).

In light of the strategy chosen, the playing of the suppressed portion of Schmidt's interview was reasonable. Attorney Johnston testified that Schmidt had decided prior to trial not to testify. Schmidt has not challenged that decision. The suppressed portion of the interview was consistent with the defense theory of manslaughter and playing it was the only way to get Schmidt's story out, without him testifying.

Schmidt's attorneys' tactical decision to play for the jury Schmidt's last version of what occurred does not constitute ineffective assistance of counsel.

### VII. *Failing to object to the admission of the sexual assault evidence kit.*

During the victim's autopsy, the medical examiner used a sexual assault kit to collect evidence, including seminal fluid. A police officer who was present testified to this fact and to the fact he transported the kit to the crime lab for analysis. A criminalist testified at trial that results of the sexual assault evidence kit revealed only Nelson's DNA and that seminal fluid had no identifiable source.

Schmidt now claims that his trial counsel were ineffective for failing to object to this evidence. He argues this evidence was not probative and was unduly prejudicial since it left the impression with the jury that Schmidt, like victim Nelson, was homosexual and the jury likely returned a guilty verdict against him because of their belief he was homosexual. Schmidt further contends that his trial counsel could not have had a tactical reason for not objecting to the sexual assault kit evidence.

Schmidt's arguments fail for several reasons. The jury heard from the police officer who attended Nelson's autopsy that the medical examiner used a sexual assault kit to collect evidence. Other evidence established Nelson was homosexual and that Schmidt was not. One of Schmidt's versions of what happened was that another man had entered Nelson's apartment and assaulted Nelson for cheating on this unknown man, implying the unknown man was also homosexual. This led to the State needing to explain the results obtained from the kit since to not do so would allow the defense to argue the results were favorable to Schmidt—i.e., that the results showed DNA of another person. Schmidt does not cite any legal authority that required his trial counsel to object to this testimony. The evidence was probative on a specific issue in the trial and its probative value was not outweighed by its prejudicial effect. *See* Iowa R. Evid. 5.401; *State v. Putman*, 848 N.W.2d 1, 9 (Iowa 2014).

As the PCR court found, we agree Schmidt failed to establish prejudice from the admission of the sexual assault kit evidence. Schmidt did not present evidence that any juror believed Schmidt was homosexual; as the PCR court found, evidence during the trial was that Schmidt was heterosexual. In addition,

Schmidt failed to present any evidence that a juror held evidence of homosexuality against Schmidt in finding him guilty. Schmidt's argument fails on this point.

### VIII. Failing to mute a portion of Schmidt's recorded statement containing a reference to a prior assault charge.

During Schmidt's recorded interrogation by the police, he referenced a prior assault charge that had been made against him. By pretrial ruling that portion of the recorded statement was excluded pursuant to Iowa Rule of Evidence 5.404(b). To comply with this ruling, Schmidt's trial counsel was going to mute that segment of the recording when he played the recording for the jury. However, Johnston failed to mute that segment of the recording, and the jury heard it.

Johnston recognized the problem he created in playing the portion of Schmidt's recorded statement mentioning the prior assault charge and immediately made a motion for mistrial. The motion was denied, but the trial court gave a limiting instruction to the jury. Based on our review of the record, we find that even though Schmidt's trial attorney breached a duty by playing the challenged portion of Schmidt's recorded statement, Schmidt did not suffer prejudice. Specifically, Schmidt denied the allegation on the recording, the discussion on the recording was short, and the limiting instruction was appropriate. "Trial courts have considerable discretion in ruling upon motions for mistrial, as they are present throughout the trial and are in a better position than [an appellate court] to gauge the effect on the jury of the matter in question." *State v. Cage*, 218 N.W.2d 582, 586 (Iowa 1974). Appellate courts will not set

aside a district court's ruling on a mistrial motion "except upon a clear showing of abuse of discretion." *State v. Staker*, 220 N.W.2d 613, 617 (Iowa 1974). There is no prejudice from a denial of a mistrial unless it sufficiently appears that the defendant has suffered a miscarriage of justice. *State v. Williamson*, 570 N.W.2d 770, 771 (Iowa 1997). Under these facts, we find no miscarriage of justice.

Schmidt also claims his appellate attorney did not raise on appeal the court's denial of the motion for mistrial. At the PCR trial, she testified a motion for a mistrial could not be made on the basis of defense counsel's own error. In his appeal brief, Schmidt argues there is no legal authority for that claim.

We cannot agree with Schmidt, as there is authority for his appellate counsel's position. A defendant may not allege an error, "which was committed or invited by him, or was the natural consequence of his own actions." *State v. Sage*, 162 N.W.2d 502, 504 (Iowa 1968). Thus, his appellate counsel was not ineffective.

### IX. Appellate counsel failing to appeal the district court's denial of Schmidt's trial attorney's motion for mistrial based on the district court's conversation with a juror without Schmidt being present.

Late on Friday afternoon, Schmidt's criminal jury was to start deliberations, but before actually starting, one of the jurors fell down the stairs at the Linn County Courthouse. The juror was transported out of the courthouse to be treated by medical personnel. The jury was to return on the following Monday. Over the weekend, the trial court contacted the juror to determine if she could continue deliberating or if an alternate juror would need to replace her. Two alternate jurors were available to be substituted for the injured juror, but she reported to the trial court that she was capable of proceeding. She appeared on

Monday and deliberated with the jury. On Monday morning, after the jury commenced its deliberations, the court held a hearing and made a record of the court's contact with the injured juror over the weekend. Schmidt's attorneys then allowed the deliberations to continue, reserving their right to make a record after the verdict. After the guilty verdict, Schmidt's counsel made their record and objected to the court allowing the injured juror to continue to serve, believing that since she had sustained a head injury and the victim in the trial had suffered a head injury, this would prejudice the juror and make her unsuitable to serve on the jury and decide Schmidt's fate. Schmidt's attorneys made a motion for mistrial based upon the trial court's failure to give the defense an opportunity to object to the injured juror. The trial court overruled this motion for mistrial. The record reflects that Schmidt's trial counsel did not object to the court's communication with the juror outside of Schmidt's or his counsel's presence.

Schmidt argues before us that the trial court breached Iowa Rule of Criminal Procedure 2.27(1), which requires a criminal defendant "to be personally present at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence . . . ." The Iowa Supreme Court has "consistently disapproved of trial courts having private communications with jurors." *State v. Epps*, 313 N.W.2d 553, 556 (Iowa 1981). However, as stated in *Epps*, the defendant must not only show the private communication occurred but must also establish prejudice by the communication. *See id.* (citing *State v. Hempton*, 310 N.W.2d 206, 209 (Iowa 1981)).

At the Monday morning hearing, where Schmidt and counsel were present, the following record was made by the district court:

> And I would like to make a record, first of all, that as we discussed on Friday, the agreement was that I would call [the injured juror] over the weekend to determine if she was capable of serving as a juror. The two alternate jurors were put on notice that they might have to be called back, one of the two of them. So I talked with [the injured juror] yesterday, Sunday, November 4. So that you know, she indicated to me at that time that she had been checked out by doctors; that she had a small contusion on her head, not a concussion; that she was—she discussed with her physicians whether or not she was capable of serving and was told she was capable of serving. She had gone to church yesterday and some other activities and was feeling fine.

This record reflects that the trial court committed no appealable error. The parties agreed on Friday after the juror was injured that the trial court would contact her over the weekend to see if she could continue to serve. Schmidt and his counsel impliedly waived his presence for the court's contact. The trial court's conversation with the juror, as recounted by the court, was confined to the agreed-upon inquiry—whether the juror was capable of continuing to deliberate. If Schmidt's counsel did not accept the court's recitation of either the agreement or the extent of the discussion with the juror, they could have stated so for the record. Further, the injured juror was available for counsel to examine on the record as to the weekend communication with the court. Schmidt's counsel did not make such a record to show prejudice due to the court's contact with the juror. Lastly, Schmidt's trial counsel did not make a motion for mistrial based on the court's contact with the juror outside Schmidt's presence. *See id.* at 555 (requiring motion to preserve error). In light of these events as disclosed by the trial record, Schmidt's appellate attorney had no basis to appeal on this issue and was not ineffective for failing to raise it.

Schmidt's second PCR claim against appellate counsel is that she did not raise the issue of Schmidt not being allowed to make a record on whether the injured juror was able to continue deliberating. Here, Schmidt cites to Iowa Rule of Criminal Procedure 2.18(15), which states that an alternate juror shall replace any regular juror who is unable to act. Schmidt's trial counsel did make a motion for mistrial on this basis, but it was denied. Schmidt's appellate counsel did not raise this as an issue on appeal.

Even if the trial court did not give Schmidt's attorneys an opportunity to make a record and object to the injured juror's continued service before reconvening the jury deliberations, Schmidt has not shown any prejudice. The juror reported she was physically able to continue with the deliberation and able to act. Iowa Rule of Criminal Procedure 2.18(15) does not apply. Nor has Schmidt presented any evidence that the juror's injury was taken into account in the jury's decision to convict Schmidt. The trial record did not support Schmidt's appellate counsel making this matter an issue on appeal, and she was not ineffective for not doing so.

## *X. Conclusion.*

Having addressed each of Schmidt's postconviction-relief issues, and finding them to have no merit, we conclude the district court should be affirmed.

**AFFIRMED.**